# United States Court of Appeals
## For the First Circuit

No. 17-2100

UNITED STATES OF AMERICA,

Appellee,

v.

BARRY DAVIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch and Lipez, Circuit Judges,
and Katzmann,* Judge.

Jane F. Peachy, Assistant Federal Public Defender, for appellant.

Mark T. Quinlivan, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

May 6, 2019

---

*Of the United States Court of International Trade, sitting by designation.

**LIPEZ**, **Circuit Judge**.  Appellant Barry Davis pleaded guilty to sex trafficking crimes pursuant to a plea agreement and was sentenced to 216 months of imprisonment.  He seeks a new sentencing hearing, claiming, in major part, that the prosecution breached the plea agreement by providing information to Probation and the court regarding victims of sex trafficking who were either covered by counts that were dismissed as part of the plea agreement, or who were never included in any counts in the indictment.  He argues that the government's actions constitute prosecutorial misconduct invalidating his waiver of appeal.  He also contends that he was provided inadequate notice of victim statements presented at the hearing.

After reviewing his claims, which are only partially preserved, we affirm the sentence imposed.

**I.**

**A. Plea Agreement**

Davis was charged in a nine-count indictment with sex trafficking by force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a) and (b)(1) (Counts One, Three, Five, and Eight); transportation of an individual with intent to engage in prostitution, in violation of 18 U.S.C. § 2421 (Counts Two, Four, Six, and Nine); and sex trafficking of a child by force, fraud, and coercion, in violation of 18 U.S.C. § 1591(a), (b)(1), and (b)(2) (Count Seven).  Davis was initially charged in a four-count

- 2 -

indictment with charges related to two women, A.Z. and T.B. The nine-count superseding indictment added charges relating to three additional women, A.O., N.S., and C.D.

Just before trial, Davis pleaded guilty to Counts One through Four, Eight, and Nine, pursuant to a plea agreement. These charges related to Davis's coercive sex trafficking of A.Z., T.B., and C.D. In return for Davis's guilty plea, the government agreed to dismiss Counts Five through Seven, relating to his alleged coercive sex trafficking of A.O. and N.S., a minor. The government further agreed not to pursue additional charges relating to obstruction of justice or witness tampering. The parties also expressly agreed that "[n]othing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case."

With respect to the sentencing guideline calculations, Davis and the government jointly agreed that Davis's base offense level is 34; his offense level should be increased by three in accordance with the count grouping principles of U.S.S.G. § 3D1.4 "because there are a total of three groups with offense levels of 34" (A.Z., T.B., and C.D.), see infra note 2; and the offense level should be reduced by three based on Davis's acceptance of responsibility, for a total offense level (TOL) of 34. The plea agreement is silent as to Davis's Criminal History Category (CHC).

Nonetheless, the parties agreed that a sentence of incarceration between 180 and 240 months would be reasonable and appropriate. Finally, the plea agreement contained a waiver of Davis's right to appeal his conviction and any sentence "within the agreed-upon sentencing range." Davis "reserve[d] the right to claim that . . . the prosecutor . . . engaged in misconduct that entitles [him] to relief from [his] conviction or sentence."

**B.    Change of Plea Hearing, Presentence Report, Sentencing Memoranda**

At the change of plea hearing, Davis represented that he had reviewed the plea agreement and understood the appellate waiver.[1] The government stated its belief that the guideline sentencing range would be 188 to 235 months if Davis were found to have a CHC of III, and 262 to 327 months if he were found to be a career offender. Defense counsel indicated that Davis understood these potential guideline ranges. In response to a question from the court asking if the government expected to call witnesses at the sentencing hearing, the government stated that it would "plan on talking to the women who were involved in this case" to determine if "they would like to either make an impact statement

---

[1] Davis does not contend that his plea was not knowing and voluntary, that he did not knowingly and voluntarily enter into the plea agreement, or that he was not aware of the waiver of his rights, including his rights of appeal. We have therefore omitted the recitation of certain facts concerning these points.

in court or in writing."  The court and defense counsel then had

the following exchange regarding these women:

> Court: They have absolutely every right under the statutes to allocute, to present to the [c]ourt, but [a]re we having an evidentiary hearing on the [g]uidelines?
>
> Defense Counsel: I don't think so, your Honor.  We have an agreement on the [g]uidelines as part of the plea agreement, so I don't think there's going to be any evidence.
>
> Court: So at most it's going to be victim impact statements, either orally or in writing?
>
> Defense Counsel: That's right, your Honor.

The government subsequently submitted a statement of the

offense conduct to the U.S. Probation Department, and Probation

included it in the presentence report (PSR) with some editing.

The statement vividly describes Davis's history of "pimping" --

providing and withholding drugs and using violence to force young,

drug-addicted women into prostitution and then taking the

proceeds.  In addition to describing Davis's conduct in 2015 with

A.Z., T.B., and C.D., the statement described his pimping of (1)

A.O., the victim in to-be-dismissed Counts Five and Six, in 2001;

(2) N.S., the minor victim in to-be-dismissed Count Seven, in 2003;

(3) C.G., an "unnamed victim/witness," in 2015; and (4) J.A., whom

Davis began pimping in 2013, and who was a witness to the counts

involving C.D.  The PSR also included this statement: "The victims

in this instance are the women who were prostituted by the

defendant.  Victim letters have been sent.  Any victim impact letters received will be forwarded to the [c]ourt and the parties."

Probation calculated Davis's TOL as 35 -- one level higher than specified in the plea agreement -- because it used a larger number of victims.  Rather than counting only A.Z., T.B., and C.D. (charged victims) as outlined in the plea agreement, Probation also counted C.G. and J.A. (victims who were not charged in the indictment).[2]  Probation further added two points to Davis's criminal history score because he was on supervised release when

---

[2] The sentencing guidelines create specific rules for grouping sex trafficking offenses.  Pursuant to U.S.S.G. § 2G1.1(d)(1), the count grouping principles in § 3D1.4 "shall be applied as if the promoting of a commercial sex act or prohibited conduct in respect to each victim had been contained in a separate count of conviction."  The special instruction to subsection (d)(1) further provides:

> [E]ach person transported, persuaded, induced, enticed, or coerced to engage in . . . a commercial sex act . . . is to be treated as a separate victim. Consequently, multiple counts involving more than one victim are not to be grouped together under §3D1.2 (Groups of Closely Related Counts).  In addition, subsection (d)(1) directs that <u>if the relevant conduct of an offense of conviction includes the promoting of a commercial sex act . . . in respect to more than one victim, whether specifically cited in the count of conviction, each such victim shall be treated as if contained in a separate count of conviction</u>.

§ 2G1.1, App. Note 5 (emphasis added).  Pursuant to the guidelines, then, Probation treated A.Z., T.B., C.D., C.G., and J.A., as if they each had been covered by a separate count, even though C.G. and J.A. had never been included as charged victims in the indictment.

he committed conduct involving J.A.  His extensive criminal history included convictions for assaults of A.O. and N.S. (victims in the to-be-dismissed counts).  Probation calculated a CHC of VI, which, when combined with the TOL of 35, yielded a guideline sentencing range of 292 to 365 months.

The government did not submit any objections to the PSR, but Davis did.  Of relevance to this appeal, he objected to: (1) including information regarding A.O. and N.S. because he denied the allegations, and the government had agreed to dismiss the counts regarding those women; (2) including information regarding C.G. and J.A. because he had not been charged with or admitted to this conduct, and because "[t]he parties have agreed in the plea agreement that [J.A. and C.G. are] not [] victim[s] for purposes of calculating the guidelines"; (3) Probation's use of C.G. and J.A. in calculating his TOL; and (4) Probation's CHC calculation, particularly the addition of two points based on his conduct involving J.A.

In his sentencing memorandum, Davis recommended a sentence of 180 months and argued that his sentence should reflect only the conduct to which he had pleaded guilty -- "the trafficking of three adult women [A.Z., T.B., and C.D.] in 2015."  He argued that the court was <u>precluded</u> from considering additional conduct "pursuant to the guidelines calculation agreed[] to by the government."  Although noting his "concerns," based on the

statement of offense conduct submitted to Probation, that the government "will not honor the terms of the plea agreement where they agreed to a guideline calculation that includes only the three victims to which [he] pled guilty," he "assum[ed] that the government will join him in th[e] argument[] that there are only three victims of the offense and that the guideline calculation set forth in the plea agreement i[s] the correct one." Nonetheless, he enclosed with his sentencing memorandum a letter he had sent the government "reminding them of their obligations pursuant to the plea agreement." In the letter, defense counsel claimed that the government's submission of information concerning A.O., N.S., C.G., and J.A. to Probation had "[e]ffected an end-run around the plea agreement," and "request[ed] that the government object to the PSR, insofar as it uses [conduct involving A.O., N.S., C.G., and J.A.] to arrive at a different guidelines calculation [than the plea agreement], and refrain from making argument regarding those alleged victims at sentencing."

In its sentencing memorandum, the government recommended a "severe sentence" of 240 months of incarceration based on Davis's "conduct in exploiting the vulnerabilities of numerous young women through psychological manipulation, force, and fear to prostitute themselves for his sole benefit," as well as his "lifetime spent violating the law." Pointing to the facts "set forth in detail in the PSR" and Davis's seeming self-centeredness and lack of

remorse,[3] the government characterized him as "a dangerous predator with no conscience." The government highlighted his state convictions for assaulting A.O. and N.S., and noted, "[a]lthough the counts involving both of these victims will be dismissed pursuant to the plea agreement, the fact that he pled guilty [to these assaults] belies his incredible claim that he is the actual victim in this case." The government further noted that it "expects the [c]ourt [at sentencing] will hear from a few of the women [Davis] victimized. Their stories . . . will further support the government's sentencing recommendation." Finally, the government contended that "[t]he nature and circumstances of [Davis]'s crimes simply do not warrant the leniency [he] is requesting."

## C. Sentencing Hearing

At the sentencing hearing, the district court accepted "the binding plea agreement [that] puts the sentencing range at between 180 and 240 months." Noting that the government had not responded to Davis's objections to the PSR's guideline calculation, the court speculated that the government may not "care" about those calculations. The government responded:

> No, your Honor, and it's our position, with the
> agreed-upon range [in the plea agreement], it really

---

[3] In its sentencing memorandum and at sentencing, the government referred to post-arrest statements and incidents allegedly demonstrating Davis's lack of remorse and sense of personal aggrievement that are not relevant to the present appeal.

> wasn't based on a [g]uideline range at the time. There were some representations in the plea agreement as to what we expected the offense level to be, and the government, based on what it knew at the time and how it viewed the counts that were charged, <u>those representations are still true</u>. We believe then Probation calculated it differently based on their view of the [g]uidelines and the facts, <u>but it doesn't matter to the sentencing</u>[.]

No. 1:16-cr-10133-PBS, Dkt. # 155, at *3-4 (emphasis added). The district court noted that the government was "dismissing out two of the victims" mentioned in the PSR and stated its intention to "basically go along with the plea agreement" regarding the guideline calculations. Therefore, the court accepted an offense level of 34 and a CHC of IV, yielding a guideline sentencing range of 210 to 262 months, substantially overlapping with the plea agreement's recommended range of 180 to 240 months.

Turning to victim statements, the court asked, "which of the three victims are we hearing from? Is it TB, AZ, and CD?" That is, the court inquired as to whether it would be hearing from the charged victims in the non-dismissed counts. The government then described several written statements it would be presenting, including a statement from a woman "who is not charged in the indictment." The judge stated that she had not yet received any statements and confirmed that defense counsel also had not yet seen them. Defense counsel interjected that she was "not entirely clear on who [will be] speaking," and the following colloquy ensued:

Defense Counsel:  I've heard that there's one person who's speaking for CD, who is a victim of one of the counts that Mr. Davis pled guilty to.  But to the extent that the government wants to submit statements of other people besides the three victims --

Court:  Well, that's what got my concern up as to who was speaking.  Let's have the ones that are the charged victims first, and then I'll address the other one.

The government presented statements by two women who were victims in the non-dismissed counts -- T.B. and C.D.[4]  Both statements described, in forceful and sometimes profane terms, the emotional toll of Davis's crimes and his predatory nature.  In her statement, T.B. stated, "I would have never done this to myself. I would have never crossed that line [into prostitution], but you dragged me over it."

The government then expressed its intention to present a statement by C.G., "who was not a charged victim or named victim in the indictment."  Defense counsel objected: "I don't think she meets the definition of a crime victim under the [Crime Victims' Rights Act, 18 U.S.C. § 3771].  Pursuant to the plea agreement, the [g]uidelines calculation only contemplates . . . three groups representing three victims."  The court overruled the objection but noted that C.G.'s statement "won't affect the [guideline] calculations."

---

[4] C.D. addressed the court, but T.B. was not present in the courtroom and her statement was read by a victim advocate.  There was no statement by the third charged victim, A.Z., because she had died of a drug overdose.

- 11 -

In her brief statement, C.G. alleged that Davis had initially posed as a drug dealer when he met her and "let[] the other girl that was there tell me what the deal really was, because the entire time you were a coward." She also recalled Davis booking hotels with his autistic son to deflect suspicion, and she opined that "any vulnerable population to you is just fair game, whether it's an addict or a disabled child that's your own."

Lastly, the government presented a written statement by A.O. Defense counsel objected "for the same reasons" stated in her objection to the statement of C.G. The court overruled the objection, and the government provided the statement to the court and to defense counsel. After a pause for them to read it, the court indicated that it had read the statement and asked defense counsel if she had done so. Defense counsel replied that she had "skimmed it" and that she again objected to its inclusion in the record: "These charges [relating to A.O.] were dismissed by agreement by the government, and yet . . . they get to put all this in front of the [c]ourt, these kind of --[.]" Before defense counsel could finish her statement, the court interjected to again overrule the objection. A.O.'s statement forcefully recounted the emotional toll of being "pulled into a life of prostitution" by Davis and described his brutal assault of her -- for which he was previously convicted -- as well as his attempts to "find [her] and get [her] back" after she escaped his control.

The prosecutor began her sentencing argument by "asking that the [c]ourt impose a 20-year sentence" -- 240 months (the top of the agreed-upon sentencing range) -- because "[f]ifteen years, the mandatory minimum, is just simply not enough to reflect what this defendant has done to so many people over the course of 15 years." She rehearsed his criminal history, his alleged lack of remorse, his use of physical force to conduct his pimping, and his purported nature as a "predator" who sought out "the most vulnerable women he could find." She again referred to the appropriateness of a twenty-year sentence. In concluding she said, "I'm asking you to sentence him to twenty years, which is every single day that he deserves."

Defense counsel advocated for the mandatory minimum sentence of fifteen years -- 180 months -- based on Davis's difficult background and a contention that the victims "were damaged individuals before they ever met" him. She contrasted his crimes with cases "involv[ing] minors" and concluded, "for somebody like Mr. Davis who's been convicted of trafficking three adult women [] basically over [] weekend trips in 2015, I think 15 years is an appropriate sentence that is consistent with what other defendants convicted of similar crimes receive for sentences."

Following Davis's allocution, in which he expressed great remorse, the court began its consideration of the sentence by reviewing the sentencing factors prescribed by 18 U.S.C.

§ 3553(a).  The court highlighted the nature of the offense: "As the victims' statements indicate, this is an extremely serious offense because it involves human trafficking of vulnerable women who are addicted to heroin."  The court was especially struck by Davis's "persistent" use of violence, "a level of violence that I don't remember in the very few [human trafficking cases] that I've had."  The court also noted that "the statements of the young women are so different really . . . but each of them suffered greatly at your hands."  After considering Davis's statements of remorse in his allocution and his difficult background, the court imposed a sentence of 216 months, because his crimes "merit above the mandatory minimum."  This timely appeal followed.

## II.

### A. Breach of Plea Agreement

Davis contends that the government breached the plea agreement when it "broke its promise . . . to advocate for a guideline calculation that included only three victims." Specifically, Davis argues that the government breached the agreement by (1) including facts pertaining to A.O., N.S., C.G., and J.A. (again, victims in to-be-dismissed counts and victims who were never included in charged counts) in the statement of offense conduct it sent to Probation; (2) not objecting to the PSR's guideline calculations; (3) not addressing the sentencing guidelines in its sentencing memorandum and instead emphasizing

- 14 -

the number of women Davis had victimized; (4) "begrudgingly" advocating for the guideline calculation in the plea agreement at the sentencing hearing; and (5) presenting the statements by C.G. and A.O.

### 1. Appellate Waiver

As a threshold matter, we must determine whether the appellate waiver in the plea agreement bars Davis's appeal as to his breach claim. On its face, the appellate waiver bars his appeal because he was sentenced within the range specified. Davis maintains, however, that his breach claim falls within the waiver exemption for a claim that the government "[1] engaged in misconduct [2] that entitles [Davis] to relief." We agree that Davis's breach claim falls within the plain language of the exemption. See United States v. Morales-Arroyo, 854 F.3d 118, 120 (1st Cir. 2017) (applying an appellate waiver based on its plain language and noting that "[w]e interpret plea agreements under basic contract principles"). Davis's claim that the government deliberately breached the plea agreement is a claim of "misconduct." See United States v. Atwood, 963 F.2d 476, 478 (1st Cir. 1992) ("[T]he appeal zeroes in on alleged prosecutorial misconduct, appellant claiming that the government breached a material term of a binding plea agreement."). If the government did in fact engage in misconduct by breaching the plea agreement, Davis would also likely be "entitle[d] to relief." See United

- 15 -

States v. Irizarry-Rosario, 903 F.3d 151, 154 (1st Cir. 2018), cert. denied, 139 S. Ct. 1201 (2019) ("[T]he government must keep its promises or the defendant must be released from the bargain." (quoting United States v. Kurkculer, 918 F.2d 295, 297 (1st Cir. 1990)). Thus, we will proceed to consider Davis's breach claim on the merits.

### 2. Standard of Review

We review de novo preserved claims that the government breached a plea agreement. United States v. Almonte-Nuñez, 771 F.3d 84, 89 (1st Cir. 2014). However, when a defendant fails to object to the alleged breach "at the sentencing hearing, [we] review[] for plain error." United States v. Gonczy, 357 F.3d 50, 52 (1st Cir. 2004) (emphasis added). The government rightly concedes that Davis preserved his contention that the government breached the plea agreement by presenting statements from C.G. and A.O. at the sentencing hearing. Davis clearly raised this issue before the district court.

We agree with the government, however, that Davis did not preserve the other aspects of his breach claim. He failed to object at the sentencing hearing to any of the government's pre-hearing conduct, that is, the government's submission of certain information to Probation, its failure to object to the PSR, and its purported failure to focus on the parties' agreed-upon guideline calculations in its sentencing memorandum. Davis's

failure to properly raise these issues with the court at sentencing engenders plain error review.  See United States v. Saxena, 229 F.3d 1, 5 (1st Cir. 2000) ("When a defendant has knowledge of conduct ostensibly amounting to a breach of a plea agreement, yet does not bring that breach to the attention of the sentencing court, we review only for plain error.").

Although Davis raised concerns about a potential breach of the plea agreement in his sentencing memorandum, he did not raise these concerns at the subsequent hearing.  The point of a timely objection is to bring a "live" issue to the district court's attention at a time when the court can effectively address any error.  See Gonczy, 357 F.3d at 52; see generally Lee v. Kemna, 534 U.S. 362, 378 (2002) ("[A]n objection which is ample and timely to bring the alleged federal error to the attention of the trial court and enable it to take appropriate corrective action is . . . sufficient to preserve the claim for review." (emphasis added) (quoting Osborne v. Ohio, 495 U.S. 103, 125 (1990)). Davis's statements in his sentencing memorandum did not accomplish such notice.  Rather, Davis paired his expression of conditional concern with an expressed assumption that the government would ultimately hew to the plea agreement when it mattered.  In the absence of any objection by Davis at the sentencing hearing, the district court could reasonably have concluded that his concerns had been alleviated.  This is precisely the scenario in which we

apply plain error review, i.e., where the complaining party does not object at the sentencing hearing to an asserted deviation from the plea agreement. See Puckett v. United States, 556 U.S. 129, 140 (2009); United States v. Oppenheimer-Torres, 806 F.3d 1, 4 (1st Cir. 2015). Accordingly, we review for plain error Davis's contention that the government breached the plea agreement through its pre-hearing conduct.[5]

We also apply plain error review to Davis's contention that the government breached the plea agreement by only "begrudgingly" advocating for the plea agreement's guideline calculation at the sentencing hearing. Davis made no objection to the government's sentencing arguments before the district court.

### 3. De Novo Review of the Preserved Claim

Davis contends that the government breached the plea agreement by "presenting" the statements by C.G. and A.O. -- a victim who was not included in any charged count and a victim in a dismissed count, respectively --  after it agreed that there are

---

[5] Davis's reliance on Gonczy is inapposite. In Gonczy, the defendant clearly raised an objection at the sentencing hearing to specific actions by the government purportedly effecting a breach of the plea agreement. See 357 F.3d at 52 ("The government's argument [for plain error review] fails not only because Gonczy's counsel did object, but because the record shows that the district court was aware of both the objection and the underlying reasons." (emphasis added)). We reject Davis's suggestion that he preserved his objection to the government's pre-hearing conduct by objecting to different conduct at the hearing.

only three victims for purposes of count grouping, A.Z., T.B., and C.D.

We have recognized a tension between the general principle that the government has a duty to provide to the court reliable information relevant to sentencing and the fact that "certain factual 'omission[s], helpful to the defendant,' may be 'an implicit part of the bargain' in a plea agreement." United States v. Miranda-Martinez, 790 F.3d 270, 274 (1st Cir. 2015) (alteration in original) (quoting United States v. Yeje-Cabrera, 430 F.3d 1, 28 (1st Cir. 2005)); see 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); U.S.S.G. § 1B1.4 (same); Almonte-Nuñez, 771 F.3d at 90 ("We repeatedly have emphasized that prosecutors have a . . . solemn obligation to provide relevant information to the sentencing court and that a plea agreement may not abridge that obligation."); Saxena, 229 F.3d at 6 ("In a nutshell, the government has an unswerving duty to bring all facts relevant to sentencing to the judge's attention.").

However, that tension is not present in this case. We disagree with Davis's contention that the count grouping language in the plea agreement constituted a promise by the government not

to rely on dismissed or uncharged conduct for any other purpose. "[I]nterpret[ing] [the] plea agreement as a whole and striv[ing] to give effect to all of its terms," Almonte-Nuñez, 771 F.3d at 89, the agreement expressly "does not limit the information that the prosecutor can convey." Miranda-Martinez, 790 F.3d at 275. To the contrary, the agreement unambiguously reserves the government's right "to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case." This broad reservation is not nullified by the specific language earlier in the plea agreement concerning the parties' agreement that "there are a total of three groups" for purposes of count grouping. C.G. and A.O.'s statements were unmistakably relevant to the district court's consideration of Davis's background, character, and conduct for imposing an appropriate sentence, see 18 U.S.C. § 3661, and Davis does not suggest that the statements lacked "sufficient indicia of reliability to support [their] probable accuracy," U.S.S.G. § 6A1.3(a).

The government's actions did not deny Davis the benefit of the plea agreement. As he acknowledges, his benefit of the bargain was the government's agreement to drop certain charges, not pursue other charges, and advocate for a sentence of no more than 240 months. See Appellant's Br. at 18 (stating that the plea agreement "hinged on the court's acceptance of the disposition contained in . . . the agreement, i.e., a sentence of incarceration

- 20 -

between 180 and 240 months" (emphasis added)).  That is what Davis bargained for, and that is what he got.  The government dropped certain charges, declined to pursue other charges, and repeatedly argued for a 240-month term of imprisonment, a sentence consistent with the agreed-upon guideline calculation using three victims.  The government did not violate the letter of the plea agreement by presenting the relevant statements of C.G. and A.O.

Nor did the presentation of the statements effect an "end-run" around the promises in the plea agreement.  See United States v. Cruz-Vázquez, 841 F.3d 546, 548 (1st Cir. 2016) ("We prohibit not only explicit repudiation of the government's assurances but also end-runs around those assurances.").  Rather, the presentation of C.G. and A.O.'s statements was consistent with the government's agreed-to ability to recommend a 240-month sentence.  There is a significant discrepancy -- 60 months -- between the top and bottom of the sentencing range that the parties agreed would be appropriate.  The government could support its "severe" sentencing recommendation and demonstrate that Davis's recommendation was too lenient by presenting statements of other women whom Davis had victimized.  See, e.g., Almonte-Nuñez, 771 F.3d at 91 ("The [plea] [a]greement allowed the prosecutor to seek the upper end of the [guideline sentencing range] contemplated by the [a]greement, and the [prosecutor] was within fair territory in emphasizing facts that made a sentence at the low end of that GSR

inappropriate."); see also Irizarry-Rosario, 903 F.3d at 155; United States v. Ubiles-Rosario, 867 F.3d 277, 287 (1st Cir. 2017). We therefore conclude that the government did not breach the plea agreement by presenting C.G. and A.O.'s statements at the sentencing hearing.[6]

### 4. Plain Error Review of the Unpreserved Claims

To establish plain error, an appellant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Almonte-Nuñez, 771 F.3d at 89 (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). We conclude that Davis has failed to meet this daunting standard.

To recap, Davis claims that the government breached the plea agreement by (1) including facts pertaining to A.O., N.S.,

---

[6] Davis's reliance on United States v. Boatner, 966 F.2d 1575 (11th Cir. 1992), is misplaced. In Boatner, the parties specifically stipulated in the plea agreement that "two ounces of cocaine would be the only [drug] quantity considered for sentencing purposes." 966 F.2d at 1577. The government then submitted information to Probation demonstrating that the defendant had been involved with three kilograms of cocaine. Id. The Eleventh Circuit determined that the government had breached the plea agreement based on an explicit provision restricting the evidence on drug quantity. Here, unlike in Boatner, the government reserved the right to present relevant information about Davis's conduct. The factual limitation in this plea agreement -- that there are three victims -- also was stated only in reference to count grouping pursuant to U.S.S.G. § 3D1.4.

C.G., and J.A. (once again, victims in to-be-dismissed counts and victims who were never included in charged counts) in the statement of offense conduct it sent to Probation; (2) not objecting to the PSR's guideline calculations; (3) not addressing the sentencing guidelines in its sentencing memorandum and instead emphasizing the number of women Davis had victimized; and (4) "begrudgingly" advocating for the guideline calculation in the plea agreement at the sentencing hearing.

We cannot conclude that the government's provision of certain information to Probation and its failure to object to the PSR's use of that information constituted a clear or obvious breach of the plea agreement. As explained above, the plea agreement provided Davis with multiple benefits, but the government explicitly reserved the right to present relevant sentencing information -- there was no promise that the government would "sugarcoat the facts" concerning his background, character, and conduct. See id. at 91.

Nor can we conclude that the government "clearly or obviously" breached the plea agreement with its sentencing memorandum or argument. See Puckett, 556 U.S. at 143. To support his claim of error, Davis relies on cases that are readily distinguishable. In Gonczy, we determined that the government had breached the plea agreement where the prosecutor "pa[id] lip service" to the agreed-upon recommended sentence but otherwise

- 23 -

argued for a higher sentence. 357 F.3d at 54. In this case, the government repeatedly recommended -- in its sentencing memorandum and at the sentencing hearing -- the "severe" 240 month sentence it was entitled to recommend under the terms of the plea agreement and never argued for a different sentence. Cf. United States v. Canada, 960 F.2d 263, 269 (1st Cir. 1992) (finding a breach where the prosecutor "failed affirmatively to recommend 36 months, as promised, and . . . went on to emphasize [the defendant]'s supervisory role in the offense and then to urge the judge to impose a 'lengthy period of incarceration' and to send 'a very strong message'").

Further, the government's actions and advocacy were not impermissibly equivocal, apologetic, or begrudging. See United States v. Velez Carrero, 77 F.3d 11, 11-12 (1st Cir. 1996); Canada, 960 F.2d at 269. We acknowledge that the government's initial statement in defense of the guideline calculation in the plea agreement -- "[t]here were some representations in the plea agreement . . . based on what [the government] knew at the time" -- could be seen as less than full-throated. However, the government directly followed by stating that the representations in the plea agreement "are still true." More fundamentally, the government's "overall conduct" -- its ultimate support of the plea agreement's guideline calculations and the recommended sentence -

- was, at the very least, "reasonably consistent" with its promises in the plea agreement.  Gonczy, 357 F.3d at 54.

## B.  Inadequate Notice Regarding Victim Statements

Davis also contends that he was not provided with adequate notice concerning the victim statements presented at the sentencing hearing and was therefore deprived of his "due process right to respond to and challenge the factual information [that the statements] contained."  Davis cannot dispute that he received notice that victim statements might be presented at the sentencing hearing.  Indeed, at the change of plea hearing, defense counsel acknowledged that such statements would be presented.  We thus focus on Davis's claim that he was provided inadequate notice regarding what he contends are new facts introduced through the victim statements at sentencing.[7]

Davis concedes that the appellate waiver bars this unpreserved claim unless enforcing the waiver "would work a miscarriage of justice."  United States v. Teeter, 257 F.3d 14, 25 (1st Cir. 2001).[8]  In Teeter, we explained that the miscarriage of

---

[7] To the extent Davis suggests that he was unfairly harmed by the statements' length or inflammatory nature, he has failed to adequately develop this argument.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[8] The relationship between the "miscarriage of justice" inquiry under Teeter and plain error review is somewhat murky. See United States v. Cabrera-Rivera, 893 F.3d 14, 30 & n.9 (1st Cir. 2018).  However, despite recognizing that miscarriage of justice and plain error review may be "functional equivalents," we

justice exception to enforcement of an otherwise valid appellate waiver should be "applied sparingly and without undue generosity" after considering factors such as "the clarity of the error, its gravity, its character[,] . . . the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result." Id. at 26.

We enforce the appellate waiver in this case for two reasons. First, it is not clear there was any error. Even assuming, without deciding, that the victim statements introduced new factual information, there is no indication that the information was "materially relied on" by the district court in determining the sentence. See United States v. Millán-Isaac, 749 F.3d 57, 70 (1st Cir. 2014). The court's focus was on Davis's violent behavior, which was well-documented in the sentencing record outside the victim statements. Second, as in United States v. Diaz-Villafane, 874 F.2d 43 (1st Cir. 1989), defense counsel "never moved for a continuance to prepare for cross-examination or to muster additional evidence." Id. at 47; see also id. ("It is

---

have followed a two-step approach of first determining whether enforcing an appellate waiver would constitute a miscarriage of justice and then reviewing the claim of error on the merits under the applicable standard of review if we have determined that the appellate waiver should be disregarded. Id. Because, as we explain, there is no miscarriage of justice in enforcing the appellate waiver as to Davis's notice claim, we do not consider whether his claim survives plain error review.

. . . incumbent upon a party [claiming unfair surprise] to ask explicitly that the court grant the time needed to regroup, or waive the point.").[9] Accordingly, the appellate waiver in the plea agreement bars his appeal on the notice issue.

## III.

For the foregoing reasons, we conclude that Davis's claim that the government breached the plea agreement fails, and that his claim that he was provided with inadequate notice regarding victim statements presented at the sentencing hearing is barred by the appellate waiver in the plea agreement. We therefore affirm the district court's sentencing judgment.

So ordered.

---

[9] Defense counsel did not lack "an adequate opportunity to register an effective objection." See United States v. Toribio-Lugo, 376 F.3d 33, 40 (1st Cir. 2004). To provide one example of a missed opportunity, counsel could have raised the notice issue or asked for a continuance after the court and defense counsel took time to read A.O.'s written statement.